FILED
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

**September 10, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 22-3125 |
| KEVIN LEWIS, | (D.C. No. 6:20-CR-10028-EFM-11) |
| Defendant - Appellant. | (D. Kan.) |

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 22-3126 |
| OTIS PONDS, | (D.C. No. 6:20-CR-10028-EFM-15) |
| Defendant - Appellant. | (D. Kan.) |

_____

**JUDGMENT**

_____

Before **MATHESON**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

This case originated in the District of Kansas and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

FILED
United States Court of Appeals
Tenth Circuit

September 10, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KEVIN LEWIS,

      Defendant - Appellant.

No. 22-3125

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

OTIS PONDS,

      Defendant - Appellant.

No. 22-3126

_____

**Appeals from the United States District Court
for the District of Kansas
(D.C. Nos. 6:20-CR-10028-EFM-11 &
6:20-CR-10028-EFM-15)**

_____

Megan L. Hayes, Attorney at Law, Laramie, Wyoming, for Defendant - Appellant Kevin Lewis.

Lynn C. Hartfield, Law Office of Lynn C. Hartfield, LLC, Denver, Colorado, for Defendant - Appellant Otis Ponds.

James A. Brown, Assistant United States Attorney (Kate E. Brubacher, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff - Appellee.

_____

Before **MATHESON**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

These consolidated appeals share two legal issues raised by two defendants convicted of crimes arising from a vast conspiracy to distribute methamphetamine, marijuana, heroin, powder cocaine, and crack cocaine in Wichita, Kansas. One defendant, Kevin Lewis, went to trial and was convicted of all charges. The other, Otis Ponds, pleaded guilty days before trial but reserved his ability to appeal two issues: (1) whether the government violated his Sixth Amendment rights to a speedy trial and (2) whether he is entitled to an order suppressing all evidence derived from one of the FBI's wiretaps, on grounds that the wiretap application was not signed by the statutorily approved Department of Justice official designated on the authorization filing, but rather was signed by some other, unknown person. Lewis raises these same two issues in his appeal. In addition, Lewis alone raises a third issue: (3) whether the length of his sentence is substantively unreasonable. We affirm the district court's judgment as to all three issues.

## BACKGROUND

Kevin Lewis and Otis Ponds were two of twenty-four defendants charged in a fifty-five-count indictment for their roles facilitating a drug-trafficking conspiracy in Wichita, Kansas. The chief of this operation was another man, Travis Knighten, who led the organization's activities from inside an Oklahoma state penitentiary. Given Knighten's confined location, he used contraband cell phones to coordinate with his "main traffickers," including Lewis and Ponds. R. vol. 1, at 156 ¶ 4. From prison, Knighten directed Lewis and Ponds to arrange and execute the purchase and sale of illegal drugs, including methamphetamine, marijuana, heroin, powder cocaine, and crack cocaine.

Though Knighten headed the organization, the FBI's investigation didn't start with him. Before the FBI knew about Knighten, a confidential source separately reported that another man, Dorzee Hill, was selling heroin in Wichita. This information from the FBI's source, plus a referral from the Wichita Police Department about gang activity in the area, spurred the FBI to begin investigating the Wichita drug-trafficking ring in the spring of 2018. The FBI began by orchestrating a series of "controlled buys" between the confidential source and Hill. R. vol. 5, at 976. This entailed the FBI sending the confidential source to Hill's house to buy heroin, with a recording device and "pre-recorded" bills, and then meeting with the source after the exchange at a predetermined location to collect the evidence—"black tar heroin." Suppl. R.

vol. 1, at 38 (sealed).[1] The FBI conducted six of these controlled buys between July 2018 and March 2019. These exchanges confirmed the FBI's suspicions that Hill was dealing heroin, but led no further. Hill had been careful not to reveal his supplier or unmask any of his co-conspirators.

To aid its investigation, the FBI began conducting physical surveillance outside Hill's residence in the fall of 2018. The FBI sometimes used GPS "pings" as part of this surveillance, to track Hill's location through his cell phone. *Id.* These tactics proved fruitless because Hill "lived on a dead-end street" surrounded by family members who "would serve as lookouts for him," and the GPS monitoring was neither accurate nor reliable. R. vol. 5, at 871. After these failed attempts at physical surveillance, the FBI resorted to installing a pole camera on a utility pole up the street from Hill's house. The pole camera went up on October 4, 2018. The pole camera recorded video footage of the comings and goings outside Hill's residence. And the FBI used it to capture many of the controlled heroin buys on camera. But the pole camera could take the FBI's investigation only so far. Much about Hill's activities and inner workings remained unknown. To bridge the gap, the FBI needed to hear Hill's conversations. So in the spring of 2019, the FBI sought its first federal authorization for a wiretap on Hill's cell phone.

---

[1] We have determined that nothing quoted from this sealed volume reveals sensitive information. Future cites in this opinion to this volume will not be designated as sealed.

In April 2019, the FBI procured its first court-authorized wiretap for a cell phone used by Hill. The first wiretap ran for one month, intercepting phone calls and texts made to and from this cell phone. Then in May 2019, the FBI secured a second authorized wiretap using information gleaned from the first. The second wiretap continued to intercept calls and texts on the same phone used by Hill, plus another of Hill's cell phones, and a third cell phone used by another codefendant. That wiretap also ran for about a month. It was during the second wiretap that the FBI first heard Hill talking to Knighten during several intercepted phone conversations. From these communications, the FBI discovered that Knighten, not Hill, was the organization's leader. So in June 2019, the FBI secured its third and final wiretap authorization, which again ran for about a month, intercepting phone calls and texts to and from three cell phones: the two previously tapped phones used by Hill, and a third used by Knighten. Lewis was intercepted on the third wiretap, talking and texting with Knighten to arrange several drug deals.[2] Conversations with Ponds were intercepted on all four cell phones across the three wiretaps. The third (and last) wiretap expired on July 20, 2019.

Days before the last wiretap ended, the FBI obtained and executed five search warrants for several residences connected to the drug conspiracy, from

_____

[2] All three wiretap applications listed Lewis as one of the "Target Subjects" and as "Hill's main source of supply for heroin." Suppl. R. vol. 1, at 29, 33.

which law enforcement seized drugs, drug paraphernalia, cell phones, cash, and firearms. This mostly concluded the FBI's investigation, but the pole camera stayed on and kept recording outside Hill's house until November 2019. According to the investigation's lead agent, FBI Agent Cameron Heath, the FBI left the pole camera running because agency policy requires that inactive pole cameras be removed from the field—removal in this case would have been risky because Hill's family was constantly watching for suspicious police activity in the neighborhood. Plus, according to Agent Heath, the FBI maintained an interest in "who was coming and going from that location" before the "indictments were going to come down." *Id.* at 981.

On February 26, 2020, a federal grand jury returned an indictment that charged twenty-four defendants, including Knighten, Hill, Lewis, and Ponds, with a slew of drug-trafficking-related crimes. Lewis was arrested on March 4, 2020, but Ponds evaded arrest until December 23, 2020.

About a year later, on April 20, 2021, the government charged its superseding indictment, which removed the defendants who had pleaded guilty and added other drug-and-gun-related charges for some remaining defendants. The superseding indictment charged Ponds with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A); two counts of maintaining a drug-involved premises, in violation of § 856(a)(1); and using a telephone to facilitate a drug-trafficking crime, in violation of § 843(b). The superseding indictment charged Lewis with conspiracy to

distribute methamphetamine, in violation of §§ 846, 841(a)(1), (b)(1)(A);

conspiracy to distribute heroin, in violation of §§ 846, 841(a)(1), (b)(1)(A);

conspiracy to distribute cocaine, in violation of §§ 846, 841(a)(1), (b)(1)(C);

conspiracy to distribute crack cocaine, in violation of §§ 846, 841(a)(1),

(b)(1)(C); maintaining a drug-involved premises, in violation of § 856(a)(1);

and three counts of using a telephone to facilitate a drug-trafficking crime, in

violation of § 843(b).

Ponds pleaded guilty on February 23, 2022. Under the terms of the plea

agreement, Ponds agreed to plead guilty to one count of maintaining a drug-

involved premises, in exchange for the government dropping the other charges

against him. The government agreed to let Ponds reserve his ability to appeal

two orders entered by the district court: (1) an order denying Ponds's motion to

suppress evidence obtained from the first wiretap, and (2) an order denying

Ponds's motion to dismiss the indictment on speedy-trial grounds. The

agreement recommended a sentencing range between 80 and 108 months, and

Ponds waived his right to appeal any sentence imposed by the district court

within this range. At sentencing, the district court imposed an 80-month

sentence.

Lewis elected to go to trial, which, after nearly two years of discovery

and a series of pretrial motions, began on February 28, 2022. After a ten-day

trial, a jury convicted Lewis on all counts charged in the superseding

indictment. The district court sentenced Lewis to serve 420 months' imprisonment.

Lewis and Ponds (Defendants) timely appealed. This court consolidated their appeals. We have jurisdiction to hear these consolidated appeals under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## DISCUSSION

Three issues are presented for our review. First, Defendants challenge the district court's denial of their motions to dismiss the indictment on constitutional speedy-trial grounds.[3] Second, Defendants dispute the district court's denial of their motions to suppress evidence derived from the first wiretap. Third, Lewis argues that his 420-month sentence is substantively unreasonable. We take these in turn, starting with the speedy-trial issue.

## I.   Speedy Trial

In November 2021, Defendants filed pretrial motions to dismiss the indictment, arguing that the government violated their Sixth Amendment rights to a speedy trial by causing a two-year delay between the indictment and the

---

[3] In Defendants' opening briefs, they also challenge the district court's ruling under the Speedy Trial Act, 18 U.S.C. § 3161(c)(1), but they abandon these arguments in their respective reply briefs. Defendants concede the government's point that any error under the Speedy Trial Act would be harmless because both Lewis and Ponds "were brought to trial within the STA's 70-day limit based on overlapping and excludable delays under the provisions of § 3161(h)(1)(D) and (H)." Resp. Br. at 20. Because the Speedy Trial Act arguments have been abandoned, we do not address them.

trial. The district court denied the motions, and Defendants now appeal that decision. We affirm.

### A.   Legal Background

The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial." U.S. Const. amend. VI. "This right attaches when the defendant is arrested or indicted, whichever comes first." *United States v. Larson*, 627 F.3d 1198, 1207 (10th Cir. 2010) (cleaned up). An infringement of the speedy-trial right requires dismissal of the indictment. *Betterman v. Montana*, 578 U.S. 437, 443–44 (2016). Though the speedy-trial remedy is severe, the right itself is "slippery." *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (explaining that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case" (citation omitted)). Because of the "amorphous quality of the right," *id.*, the Supreme Court has issued a flexible, four-factor balancing test that weighs "the conduct of both the prosecution and the defendant," *id.* at 530, to determine whether a speedy-trial error has occurred. These so-called *Barker* factors are (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the speedy-trial right, and (4) prejudice to the defendant. *Id.*

***Length of Delay.*** The length-of-delay factor is a "double inquiry," the first part being a threshold to the *Barker* analysis. *United States v. Seltzer*, 595 F.3d 1170, 1176 (10th Cir. 2010). We consider first whether the defendant has shown a "presumptively prejudicial" delay sufficient "to trigger a speedy trial

analysis," which is any delay longer than one year. *Id.* (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)). If the defendant cannot show a one-year-plus delay, then we do not proceed to the remaining factors. *See Barker*, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). But if the defendant has shown a presumptively prejudicial delay, we then consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Seltzer*, 595 F.3d at 1176 (quoting *Doggett*, 505 U.S. at 652). In doing so, we may account for the complexity of the charges. *See id.*

**Reason for Delay.** The second factor—the reason for delay—has been touted as "[t]he flag all litigants seek to capture." *United States v. Keith*, 61 F.4th 839, 852 (10th Cir. 2023) (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)). At this stage, "[i]t is incumbent upon the government to present acceptable reasons for the delay." *United States v. Margheim*, 770 F.3d 1312, 1326 (10th Cir. 2014). Not all reasons for a delay are weighed the same. We fault the government more for a "purposeful delay or delay to gain advantage" and less for delays caused by "negligence." *Id.* (quoting *United States v. Gould*, 672 F.3d 930, 937 (10th Cir. 2012)); *see Barker*, 407 U.S. at 531 ("[D]ifferent weights should be assigned to different reasons."). Likewise, we hold the defendant accountable for self-inflicted delays, including those attributable to filing pretrial motions or seeking continuances. *United States v.*

*Tranakos*, 911 F.2d 1422, 1428 (10th Cir. 1990); *see, e.g.*, *United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006) (finding "little merit" in defendant's Sixth Amendment speedy-trial claim because "in the wake of the government's legitimate request for a continuance" defendant "sat on his hands for seven months and requested several continuances of his own").

Often, the government and the defense share the blame for various pretrial delays, so in assessing the reason-for-delay factor under *Barker*, "we attempt to 'divide' the overall delay into discrete 'periods.'" *United States v. Muhtorov*, 20 F.4th 558, 639–40 (10th Cir. 2021) (quoting *United States v. Black*, 830 F.3d 1099, 1113 (10th Cir. 2016)). Then, for each one, we decide "whether the government or the criminal defendant is more to blame for the delay." *Id.* at 640 (quoting *Doggett*, 505 U.S. at 651). This splicing exercise doesn't end with us observing which party is blameworthy for the longest stretch of delay and then automatically weighing the second *Barker* factor against that party. *See id.* We also pay attention "to the circumstances that caused [each] delay" because this tells us "how strongly to weigh it." *Id.* For instance, a shorter (yet nefariously motivated) delay counts more heavily against the responsible party than a longer (yet innocuously caused) one. *See id.* ("For example, 'even if the defendant is responsible for a majority of the delay, we could weigh the second *Barker* factor against the government if the government delayed the trial to gain an advantage over the defendant or to deprive the defendant of his ability to defend himself at trial.'" (quoting *Black*,

830 F.3d at 1120)). So we must examine each segment of the total pretrial delay separately, considering which party caused each portion and why.

*Assertion of Right.* For the assertion-of-right factor, we simply look to "whether the defendant 'actively' asserted his right," or rather, "whether the defendant's behavior during the course of litigation evince[d] a desire to go to trial." *Keith*, 61 F.4th at 853 (quoting *United States v. Koerber*, 10 F.4th 1083, 1110 (10th Cir. 2021)); *see Margheim*, 770 F.3d at 1328 (noting "the frequency and force of [defendant's] objections" in weighing the strength of defendant's assertion of his speedy-trial right (cleaned up)).

*Prejudice.* Last, we consider the prejudice that the delay caused to the defendant. This requires the defendant to "make a particularized showing" that the delay prejudiced an interest that the speedy-trial right is designed to protect: "(i) the prevention of oppressive pretrial incarceration; (ii) the minimization of anxiety and concern of the accused; and (iii) the minimization of the possibility that the defense will be impaired." *Black*, 830 F.3d at 1122 (quoting *United States v. Hicks*, 779 F.3d 1163, 1169 (10th Cir. 2015)). The defendant's failure to show prejudice "eviscerate[s]" his claim. *Keith*, 61 F.4th at 854 (quoting *Margheim*, 770 F.3d at 1329); *see Gould*, 672 F.3d at 939 ("A showing of prejudice may not be absolutely necessary in order to find a Sixth Amendment violation, but we have great reluctance to find a speedy trial deprivation where there is no prejudice." (quoting *Perez v. Sullivan*, 793 F.2d 249, 256 (10th Cir. 1986))).

## B.    Pertinent Facts

Lewis and Ponds were indicted on February 26, 2020. Lewis was arrested about a week later, on March 4, 2020, and he first appeared in court on March 6, 2020. The district court entered an order detaining Lewis pending trial on March 10, 2020. Lewis's trial began on February 28, 2022. So Lewis spent almost two years in pretrial detention, from March 4, 2020, until February 28, 2022.

Ponds's route was more circuitous—he did not appear in Kansas district court until March 2021, almost a year after Lewis. After being indicted in February 2020, Ponds was "operating, living, [and] working under a false ID" in California, apparently to "remain undetected" by federal authorities.[4] R. vol. 5, at 407–08. Then, on December 23, 2020, law enforcement finally apprehended Ponds and arrested him based on the charges in the indictment. He was then transferred to federal custody in Kansas, and he appeared for his detention hearing before a Kansas magistrate judge on March 1, 2021. The magistrate ordered Ponds released on conditions but, days later, on March 5, 2021, the government successfully appealed the magistrate's order to the district court. The district court ordered Ponds to be detained pending trial. Ponds entered his guilty plea on February 23, 2022, five days before trial began. So from his initial arrest in California until his guilty plea, Ponds spent

---

[4] Ponds challenges this characterization, but as we explain in n.9, *infra*, we do not count this period against Ponds for speedy-trial purposes.

a little over one year in detention, from December 23, 2020, until February 23, 2022.

The district court initially set Lewis's trial date for May 26, 2020, which the court soon modified to June 2, 2020. Then, on April 2, 2020, the government filed a motion to declare the case complex, after which the district court held a status conference, on April 29, 2020. The court heard arguments on the motion and attempted to set a realistic timeline for discovery.[5] Around the same time, the court appointed a coordinating discovery attorney to manage the discovery process.

After the April status conference, on May 1, 2020, the district court granted the government's motion to declare the case complex. The district court found the case complex based on the large number of defendants, the interception of communications from four phone lines, the amount of discoverable material (including "a significant number of transcripts and recorded conversations in addition to phone downloads and surveillance videos"), the "interfer[ence] with discovery production" caused by the COVID-19 pandemic, and the need "for defense counsel to review, organize, and digest the materials." R. vol. 1, at 396. This order released the case from the time limits imposed by the Speedy Trial Act. In the same order, the court set a status conference for July 10, 2020, to track the progress of discovery.

---

[5] At the April 29, 2020 status conference, Lewis objected to the government's motion to declare the case complex and requested a speedy trial.

The July 10, 2020 status conference was the first time the length of the pole-camera footage was specifically raised as a potential slowdown for the discovery process. By this point, the government hadn't yet produced the pole-camera footage due to "technical glitches." R. vol. 5, at 181. But it had given the "bulk" of the other discovery to defense counsel.[6] *Id.* The government acknowledged that the pole-camera footage was "quite large" because the camera had been "running for 24 hours a day for 13 months." *Id.* at 180. Counsel hoped that the government might "pare down" the footage or provide defense counsel with more detail about which segments of the footage were relevant. *Id.* at 185. The district court considered this obstacle and posited that even the government identifying the relevant segments of the footage might not "exhaust [defense counsels'] own obligations with respect to what may happen on the video." *Id.* at 190. Yet the court acknowledged that, because the pole camera outside Hill's house ran nonstop for thirteen months, there would be large portions of the video where, as the court put it, "nothing's happening." *Id.* at 187.

By the next status conference, on August 21, 2020, one defense attorney confirmed that all the defendants' counsel had received the pole-camera footage from the government and that paralegals were "making their way through it."

---

[6] This included "line sheets, the T3 apps and orders, the phone calls themselves, police reports, phone downloads, a drone video, search warrant photos and reports, arrest interviews, videos, most of the lab results, [and] some of the nexus reports on the firearms." R. vol. 5, at 180.

15

*Id.* at 212. That attorney estimated that the two paralegals reviewing the footage would require another two-to-three months to finish reviewing the pole-camera footage. The court clarified that the purpose of the paralegals' review was "to identify what portions of the video [defense counsel] need to look at." *Id.* at 218–19. So to speed the process along, and "in the interests of the defendants, particularly those detained," the court sanctioned the use of a third paralegal to help review the footage. *Id.* at 220.

At the next status conference on October 2, 2020, the defense reported that the paralegals were not expected to complete the pole-camera-footage review until the first of the year in 2021. On November 19, 2020, during the next status conference, the district court prodded the government about its timeline for producing the segments of the footage it planned to use at trial. The court then gave the government "an aspirational date" of sixty days to produce these segments. On January 13, 2021, the status conference report was that the paralegals had finished reviewing "about a quarter" of the pole-camera footage and were moving at a rate of "two and a half to five hours per 24-hour period to review." *Id.* at 285. Based on that pace, the paralegals estimated that they would complete the review by June 2021. With this update, the defense relayed to the court that "the video is pretty grainy," that "it's difficult to make out specific individuals or vehicles," and that "you can't see what's going on." *Id.* The government also updated the court that it was "about halfway through" the pole-camera footage, having identified "somewhere between 30 and 40

specific dates and times" that it might introduce as part of its case in chief against the many defendants still awaiting trial. *Id.* at 288–89. The government added that it was on pace to meet the court's February 19, 2021 deadline for producing the relevant segments of footage to the defense. The court ended by expressing its "overarching concerns" about "the discovery procedures that the federal law enforcements have used to accumulate so much video." *Id.* at 290. The court stressed that "defense [counsel] may view some items captured on video as potentially exculpatory in ways perhaps the Government would not perceive them," which "compels the defense team to review all of the images that have been captured." *Id.* at 291.

At the start of the next status conference on March 15, 2021, the government confirmed that it had met the court's sixty-day deadline to produce the relevant segments from the pole-camera footage. The defense reported that the paralegals had completed reviewing "149 of the 416 days of footage." *Id.* at 420. Counsel attributed the slow progress to "more activity and possibly more relevant information" on the recording. *Id.* By the next conference on June 7, 2021, the paralegals had finished viewing all the relevant portions of pole-camera footage identified by the government and provided summaries of those segments to all defense counsel. Still, the court was alarmed at the time consumed by reviewing pole-camera footage and remarked that the case's passing "the year anniversary mark" triggered "constitutional speedy-trial considerations." *Id.* at 452–53. Even so, the court maintained that "defense

[counsel] have an obligation to provide effective assistance to review all the evidence that's there, to see if there's anything exculpatory in one fashion or another for their client." *Id.* at 454. This "obligation," the court pressed, was not "relieve[d]" by the government producing the relevant segments of pole-camera footage to the defense. *Id.*

About a month later, on July 19, 2021, Ponds filed a notice of demand for a speedy trial. Just over a week later, on July 29, 2021, the district court held a pole-camera meeting, during which it admonished the government for producing "over 10,000 hours of pole camera video," yet planning to use no more than two hours of footage at trial. *Id.* at 466 Still, the court restated that "defense counsel are obligated, all 24 of them, to look at in some way—if not themselves, through their legal assistants—all 10,000-plus hours of discovery in this case." *Id.* at 469. Failing to do so, the court cautioned, could "imperil the actual trial." *Id.* at 472. The court noted Ponds's demand for a speedy trial, and Lewis's counsel told the court that he planned to file a speedy-trial motion, as well. The court anticipated that these motions would be "colorable" because, though law enforcement was "entitled" to install a pole camera, the court saw "no good reason to collect 400 days of pole camera" footage. *Id.* at 470–71.

The painstaking pole-camera-review process finally ended in September 2021. With discovery over, the court scheduled a pretrial motions deadline for November 15, 2021, and set a trial date for February 28, 2022. In November 2021, Lewis and Ponds filed their motions to dismiss the indictment on speedy-

trial grounds.[7] The motions alleged that the government had unconstitutionally delayed trial by producing over 10,000 hours of pole-camera footage that defense counsel were ethically obligated to review.[8]

After hearing arguments on the speedy-trial motion, the district court issued a written order on February 16, 2022, denying both motions. *United States v. Lewis*, 586 F. Supp. 3d 1094 (D. Kan. 2022). The court first recounted the investigatory tactics the FBI deployed during its "sprawling" investigation, including "60,000 intercepted communications" yielded from "six trap and trace warrants and three Title III interception [wiretap] authorizations." *Id.* at 1098. The FBI had additionally engaged in physical surveillance, executed search warrants, and installed two pole cameras, one of which represented "the source of [Defendants'] woes" and the impetus for the speedy-trial motions under review. *Id.*

To decide whether the trial's nearly two-year delay violated Defendants' speedy-trial rights, the court applied the four *Barker* factors. *See id.* at 1100. First (length of delay), the court concluded this factor was "neutral" because the delay was not so egregious considering the complexity of the case. *Id.* at

---

[7] The day of the pretrial-motions deadline, November 15, 2021, Ponds filed a motion to discharge his counsel. The court denied this motion. Because of this delay, the court allowed Ponds until November 24, 2021, to file his pretrial motions. On November 24, 2021, Ponds filed his motion to dismiss the indictment on speedy-trial grounds.

[8] Neither of Defendants' speedy-trial motions cite the 60,000 phone calls and texts as cause for the pretrial delay.

1100–01 (referring to the "60,000 intercepted calls and texts, and 10,000 hours of pole camera footage"). Second (reason for delay), the court reasoned that "[t]he blame . . . lies at the feet of the Government" for causing defense counsel to review thousands of hours of pole-camera footage, and though "there is no evidence of purposeful delay," this factor "weighs slightly in favor of [Defendants]" because of the government's "negligence." *Id.* at 1102. Third (assertion of right), the court found this factor favored both Defendants because Lewis had "asserted his speedy trial rights early and often," while Ponds too had "asserted his rights a mere three or four months after he appeared before this Court." *Id.* at 1103. Fourth (prejudice), the court listed the three ways a defendant might show prejudice—"(i) oppressive pretrial incarceration; (ii) anxiety and concern associated with such incarceration; and (iii) the possibility that the defense will be impaired"—and having considered these, it observed that all of Defendants' prejudice claims were "equivocal," "generalized," "conclusory," or "unavailing." *Id.* at 1104–05 (citation omitted). Based on Defendants' failure to show prejudice, which is "nearly fatal" to a speedy-trial claim, the district court denied both motions. *Id.* at 1105 (quoting *United States v. Nixon*, 919 F.3d 1265, 1278 (10th Cir. 2019)).

### C.    Analysis

We review de novo a defendant's claim for violation of the Sixth Amendment right to a speedy trial, "accepting the district court's factual findings unless they are clearly erroneous." *United States v. Medina*, 918 F.3d

774, 788 (10th Cir. 2019). We proceed by applying the four *Barker* factors and then balancing them to determine whether the nearly two-year delay between the indictment and Lewis's trial and Ponds's guilty plea violated the Constitution's speedy-trial guarantee. No single factor is dispositive. *Id.* at 780. But an inability to show prejudice will typically "eviscerate the defendant's claim." *Margheim*, 770 F.3d at 1329.

### 1.   Length of Delay

The government concedes that Lewis and Ponds each experienced a presumptively prejudicial delay. Both Defendants were indicted on February 26, 2020, Ponds entered his guilty plea on February 23, 2022, and Lewis's trial began on February 28, 2022. This two-year delay is sufficient for Defendants to have "clear[ed] the 'gate'" and to trigger a speedy-trial analysis. *Muhtorov*, 20 F.4th at 638. But the delay was not unreasonable given the complexity of the charges, so this factor favors Defendants only slightly. *See Seltzer*, 595 F.3d at 1176 ("[E]ven a two-year interval between charges and trial may not be deemed a 'delay' when the charges are complex.").

### 2.   Reason for Delay

The district court identified the 10,000 hours of pole-camera footage as "the entire reason for the delay." *Lewis*, 586 F. Supp. 3d at 1101. Though the district court recognized pole cameras as a generally "viable investigative tactic," it faulted the government's strategy here "to maintain *continuous*

digital surveillance of Defendant Hill's house for well over a year," without a "clear reason." *Id.*

Defendants arguments on appeal reflect the district court's reasoning. Defendants contend that the 10,000 hours of pole-camera footage, and consequently the time it took for defense counsel to review it, caused most of the pretrial delay. They assert that the FBI's leaving an unmonitored pole camera outside Hill's house for thirteen months, running 24/7, was "reckless, not merely negligent," Ponds Op. Br. at 26, because that decision "resulted in many more months of video footage for defense attorneys to slog through and created significant delays in bringing [Defendants] to trial," Lewis Op. Br. at 30.

In evaluating the reason-for-delay factor, we "'divide' the overall delay into . . . manageable units of analysis," so that for each one we might determine who and what caused that portion of delay. *Muhtorov*, 20 F.4th at 639–40. That task is tougher here because the district court did not divide the pretrial timeline into "manageable units of analysis." *Id.* at 640. So we begin there, by reviewing the pretrial timeline as we see it according to the record. We may then decide which party is responsible for each period of delay and consider

whether each period "should weigh for or against a constitutional violation."[9]
*Id.*

Defendants' right to a speedy trial attached on the day the indictment was filed—February 26, 2020. *See Medina*, 918 F.3d at 779 ("Th[e] right attaches when the defendant is arrested or indicted, whichever comes first." (citation omitted)).[10] Ponds pleaded guilty on February 23, 2022, and Lewis's trial began on February 28, 2022. So the total delay period ran almost exactly two years, or twenty-four months. That twenty-four-month delay divides as follows.

**February 2020–July 2020: Initial Discovery.** The first five months of delay—from February 2020 until the second status conference on July 10, 2020—Defendants do not challenge. During this time, Ponds was still in California evading authorities, and Lewis was receiving discovery from the

---

[9] The government parses the reason-for-delay timeline according to each defendant. Though we recognize that Lewis's and Ponds's pretrial paths were slightly different (because Ponds evaded arrest for the first ten months after the indictment was charged and didn't appear in court until March 2021), we don't find it useful to divide the pretrial timeline this way. The crux of Defendants' speedy-trial claims is that the government erred by accumulating 10,000 hours of pole-camera footage and unconstitutionally delayed trial as a result. By the time Ponds was apprehended and appeared in court in March 2021, the pole-camera review was still ongoing. So counting the first year or so of Ponds's pretrial-detention period against him, as the government does, doesn't help us resolve the pole-camera issue. Nor does it change the outcome of the speedy-trial issue, which we ultimately decide against Defendants, because their failure to show prejudice weighs so heavily against them under *Barker*.

[10] Ponds was arrested on December 23, 2020, almost ten months after the indictment was filed. *See Medina*, 918 F.3d at 779. But his speedy-trial clock started the same day as Lewis, even though he did not appear before the Kansas district court until March 2021.

government along with the rest of the defendants. Defense counsel had not yet started reviewing the pole-camera footage because of technical glitches with the video, which the government was still resolving with the coordinating discovery attorney. Defendants do not assert, nor do we perceive, that this delay was deliberate or negligent on the government's part. *Cf. Medina*, 918 F.3d at 789 (reasoning that the government had not displayed "the kind of 'neutral . . . negligence' that is properly weighed against [it]" where defendant's federal trial was delayed during pending state-court proceedings, because the government made efforts not to let the federal case "languish" (quoting *Barker*, 407 U.S. at 531)). So neither party is responsible for the initial five-month period, and it does not weigh for or against a constitutional violation.[11]

**August 2020–September 2021: Pole-Camera Review.** The second period of delay runs from August 2020 to September 2021: the time it took defense counsel to review all 10,000 hours of pole-camera footage. By the August 21, 2020 status conference, the paralegals' review of the footage was underway, and this process was not complete until an unknown date in September 2021. This fourteen-month period is Defendants' main source of consternation. They

---

[11] Though "the delay can still favor one side or the other" even "[w]hen neither [party] is to blame," that is not the case here. *Muhtorov*, 20 F.4th at 640. Technical glitches are not "traceable" to either party. *Id.*

blame the government for this entire period of delay, for essentially the same reasons that the district court did. But in our view, this is not so clear cut.

The district court found the FBI negligent for installing a pole camera and then leaving it on, unmonitored, for thirteen months straight. *See Lewis*, 586 F. Supp. 3d at 1101. True, the FBI installed the pole camera outside of Hill's residence on October 4, 2018, and left it up until sometime in November 2019, without an agent constantly monitoring the live recording. But the district court acknowledged that pole cameras are an accepted, "viable investigative tactic." *Id.* Indeed, in this case, the pole camera captured on video some of the FBI's controlled heroin buys from Hill. These controlled buys spanned the course of months, from July 2018 through March 2019. The pole-camera footage of these exchanges helped law enforcement establish probable cause and necessity when it sought authorization for the first wiretap of Hill's cell phone. Pole cameras naturally complement wiretap surveillance because pole cameras lack "audio capability." Suppl. R. vol. 1, at 56. So the FBI's expansive operation of pole cameras in what the district court called a "sprawling" drug investigation should come as no surprise. *Lewis*, 586 F. Supp. 3d at 1098. We disagree with the district court and Defendants that the FBI's decision to operate a 24/7 pole camera for months was per se unreasonable. We

do not blame the government for this portion of the delay solely based on its continuous use of a pole camera.[12]

What Defendants ignore about this apparently "abysmal" investigative tactic is that the true source of the delay was not the footage itself but, rather, the time required for defense counsel to *review* the footage. Lewis Op. Br. at 29. The district court insisted throughout the pretrial status conferences that defense counsel had an "obligation" to review "all 10,000-plus hours" of pole-camera footage for "anything exculpatory." R. vol. 5, at 454, 469. But not once did the district court or defense counsel offer up an example of what such

---

[12] The only period of pole-camera footage that might arguably have been negligent on the government's part was the footage obtained between July 20, 2019, and November 2019: the time from when the last wiretap ended until the pole camera came down. After the last wiretap ended, there was, conceivably, no reason for the FBI to continue monitoring Hill's home for four additional months. This is how the government conceives of Defendants' argument. Though Defendants challenge this characterization and maintain that their argument attacks the entire 10,000 hours of footage, Ponds agrees in his reply brief that "it was particularly egregious to leave the camera running after the investigation had largely wrapped." Ponds Reply Br. at 11–12. Because Defendants don't define their argument by the pre- versus post-wiretap dividing line, we agree that the government mischaracterizes their arguments. But we acknowledge that by the March 15, 2021 status conference (nearly seven months into the objectionable fourteen-month delay), the paralegals had reviewed pole-camera footage only through about February 2019—nearly five months *before* the last wiretap came down. It's unclear from the record when the paralegals surpassed the July 20, 2019 mark in the footage. All this to say, at least half of the delay period that Defendants now challenge was occupied reviewing pole-camera footage captured while the wiretaps were still running, which makes that footage undeniably legitimate. This is because the "visual observations" obtained from pole cameras assist law enforcement in "characteriz[ing]" and contextualizing the conversations intercepted over wiretaps. Suppl. R. vol. 1, at 56.

26

exculpatory evidence might be. The government introduced one pole-camera segment at trial as evidence of Lewis's involvement in a heroin deal. In the video, Lewis is purportedly pulling up to Hill's house in a van, less than ten minutes after the wiretap intercepted a phone call between Lewis and Hill, in which Lewis said, "I just picked up the 20 ounces . . . and I'll head that way." R. vol. 6, at 1050. A few minutes after the pole camera showed the van pulling away, the wiretap intercepted a call between Hill and another codefendant, in which Hill said that a bag of heroin had been delivered. About twenty minutes after that, Lewis texted Knighten's cell phone to confirm that Hill gave Lewis $5,000 in exchange for the twenty ounces of heroin he had just delivered. We cannot conceive of anything defense counsel could have found on the pole-camera footage to refute this evidence.

Besides, defense counsel acknowledged that the footage was "pretty grainy," that it was "difficult to make out specific individuals or vehicles," and that it was hard to "see what's going on." R. vol. 5, at 285. Indeed, FBI Agent Heath testified that, in the video clip of Lewis's drop off, neither the license plate on the van nor the driver were discernible, though the government had established by other evidence that Lewis owned and regularly drove a van.

So even if there were something exculpatory on the pole camera—and, again, we strain to see what that could possibly be—the pole-camera footage was among the weaker evidence offered at trial because the picture was so difficult to decipher. The defense counsel at trial could have more efficiently

(and likely effectively) rebutted the pole-camera footage by simply emphasizing to the jury that, after thirteen months of surveillance, all the government could scrounge up was one short, grainy clip of *someone* pulling up to Hill's house in a van. Given the state of the pole-camera footage and its unlikelihood to produce anything exculpatory, this sort of strategic calculus by the defense team would have been perfectly reasonable and within the bounds of counsels' effective-assistance obligation. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *see also United States v. Kearn*, 90 F.4th 1301, 1306 (10th Cir. 2024) (noting that we judge the effectiveness of defense counsel's assistance by "an objective standard of reasonableness" (quoting *Lee v. United States*, 582 U.S. 357, 363 (2017)).

Even without the 10,000 hours of pole-camera footage, it's conceivable to us that discovery might have lasted just as long given that the government had also produced 60,000 phone calls and texts. We find it odd that Defendants assign blame for the entire fourteen-month delay to the pole-camera footage, with no mention or explanation of how this timeline overlapped with their review of the 60,000 phone calls and text messages. It seems to us that 60,000 phone communications would have posed a commensurately burdensome

28

amount of discovery for counsel to review. And unlike the pole-camera footage, which was not particularly compelling given its poor quality, the heart of this case lies in the phone communications. This discovery should have been far more consequential to Defendants, and yet the record from the status conferences is nearly silent about when and how this discovery was reviewed—separately or in tandem—with the pole-camera discovery.

At the January 13, 2020 status conference, the government told the court it would take additional time to produce the co-conspirator statements it intended to introduce from the wiretaps because "our focus has been on identifying the polecam," and so "we've pulled away from the wire itself." R. vol. 5, at 295. Defense counsel never offered any similar explanation for how review of the 60,000 phone calls and text messages was being balanced with the 10,000 hours of pole-camera footage.

At the pretrial motions hearing on February 11, 2022, the government raised the point again about the purported tension between the time taken to review 10,000 hours of footage versus 60,000 phone calls and texts, but it gained no traction with the court. The government merely wondered how long it took defense counsel to review the 60,000 phone communications because, according to the prosecutor, it had taken the government "months." *Id.* at 1280. Ponds's reply brief attempts to address this point by noting that, generally, "widely available data search programs . . . allow defense attorneys to review only pertinent reports and phone calls" much more quickly than video footage.

29

Ponds Reply Br. at 12. But Ponds doesn't assert that his counsel availed himself of these programs to review the discovery in this case. Even if we were to assume that such programs were used, 60,000 calls and texts is still a significant chunk. Without any explanation as to when this portion of the discovery was reviewed, by whom, and how long it took, we doubt that the entire delay from August 2020 from September 2021 can be attributed solely to the length of the pole-camera footage.

That said, we do not fault Defendants for this period of delay. The district court essentially ordered defense counsel to persist in reviewing every moment of pole-camera footage. We will not hold their compliance against them.

But we do blame the government for its lack of preparedness in producing the segments of footage it planned to introduce at trial. When the government indicts, it must be prepared to try its case. *See Barker*, 407 U.S. at 527 (stressing that it is "the State['s] . . . duty" "to bring [the defendant] to trial" and to "insur[e] that the trial is consistent with due process"); *Dickey v. Florida*, 398 U.S. 30, 38 (1970) ("[T]he right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial."); *see also United States v. Sims*, 776 F.3d 583, 586 (8th Cir. 2015) (upholding the district court's sanction against the government to exclude DNA evidence that the government produced less than a week before trial, despite the government's statement days earlier that "it was 'definitely

ready for trial'"). It should not have taken the government from August 2020 until February 2021—about seven months—to produce the few segments of footage relevant to its case in chief. "[T]he burden is on the prosecution to explain the cause of the pre-trial delay." *United States v. Jumaev*, 20 F.4th 518, 533 (10th Cir. 2021) (citation omitted). So even though the district court waited until November 2020 to order the government to identify the relevant pole-camera segments by February 2021, the government must bear some burden for being ill-prepared. On this basis, we determine that the government caused the approximately seven-month period of delay from the production of the pole-camera footage (August 2020) until the identification of the relevant segments (February 2021).[13] The government is therefore responsible for these seven months of pretrial delay.

**October 2021–February 2022: Pretrial Motions.** After the pole-camera review finished, the last five months before trial were spent resolving Defendants' various pretrial motions, including the motions to dismiss and motions to suppress under review in these appeals. Defendants are responsible for delays caused by pretrial motions. *See Keith*, 61 F.4th at 852 ("[A] defendant's actions that delay his own trial weigh heavily against him."); *United States v. Toombs*, 574 F.3d 1262, 1274 (10th Cir. 2009) (weighing "423 [days of delay] . . . attributable to motions filed by [the defendant]" "heavily

---

[13] This assumes that defendants were not reviewing the 60,000 phone calls and texts during this time.

against [him]"); *see also Tranakos*, 911 F.2d at 1428 (determining "delays do not weigh against the government" when they "are attributable to motions filed and continuances sought by the defendants").

***Weighing the Periods of Delay.*** Having "numerically assess[ed] the reason-for-delay factor," we must now decide "how heavily [each] delay weighs" against the responsible parties. *Muhtorov*, 20 F.4th at 640 (citations omitted). We've determined that the government is responsible for seven months of delay and that Defendants are responsible for five months of delay. There is no evidence that the government's delay in identifying the pole-camera segments was "[a] deliberate attempt to delay the trial in order to hamper the defense," so we weigh this "less heavily" against the government. *Barker*, 407 U.S. at 531. Yet "a defendant's actions that delay his own trial weigh heavily against him," so we must weigh the five months of delay attributable to pretrial motions heavily against Defendants. *Keith*, 61 F.4th at 852. Still, "the ultimate responsibility" for speedy-trial delays "must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531. For that reason and because the government's delay was longer, we count the second *Barker* factor slightly against the government.

\* \* \*

Pole cameras typically run for long periods during large-scale drug investigations like this one, so this will likely not be the last time a district court faces the problem that arose here. Going forward, to avoid the protracted

discovery process that unfolded in this case, district courts should issue the government a reasonably prompt deadline to identify any relevant segments of pole-camera footage. Had the court done so here, in August 2020, it's likely one of two outcomes would have resulted: either, the government would have prioritized gathering the relevant video and expedited the defense's review process from the get-go; or, the government would have thrown up its hands and walked away from the footage altogether, knowing the strength of its evidence lay in the wiretap intercepts, anyway. Of course, if defense counsel states a plausible need to review the footage for exculpatory reasons, he may request a continuance to do so, but that time would weigh against the defense.

### 3.    Assertion of the Speedy-Trial Right

The government accepts the district court's finding that this factor favors Defendants. After his initial appearance on March 1, 2021, Ponds filed a notice demanding a speedy trial on July 19, 2021, and a motion to dismiss the indictment on speedy-trial grounds on November 24, 2021. The district court reasoned that this "early and persistent assertion" of his speedy-trial right sufficiently "tip[ped] this factor in Ponds' favor." *Lewis*, 586 F. Supp. 3d at 1103 (citation omitted). The same went for Lewis. The district court observed that Lewis had consistently invoked his right to a speedy trial since his arraignment, "renew[ing] this objection at virtually every hearing." *Id.* That, plus Lewis's refraining from seeking any continuances, favored the third *Barker* factor toward Lewis.

We agree with the district court's conclusion that this factor favors
Defendants. And given that the government doesn't challenge the court's
determination on appeal, we move on to prejudice.

### 4.   Prejudice

When the defendant has endured an "extreme" delay, meaning a delay
over six years, prejudice may be presumed. *See Muhtorov*, 20 F.4th at 653. The
two-year delay under review here does not trigger that presumption. This means
Lewis and Ponds each have to "make a particularized showing of prejudice"
caused by the pretrial delay. *Hicks*, 779 F.3d at 1169. Prejudice from a speedy-
trial violation reflects "the particular evils the speedy trial right is intended to
avert: pretrial incarceration; anxiety and concern of the accused; and the
possibility that the defense will be impaired." *Keith*, 61 F.4th at 854 (quoting
*Koerber*, 10 F.4th at 1110). Neither Lewis nor Ponds demonstrate prejudice.

*Lewis.* Lewis alleges that he suffered undue and oppressive pretrial
detention because he was held in a local county jail during the COVID-19
pandemic. Lewis presents evidence that county jails were known to be
particularly unsafe during the pandemic because of "antiquated" ventilation
systems and a lack of social distancing. Though Lewis says he contracted
COVID-19 during his pretrial detention, he does not allege that he was
subjected to harsher conditions compared to other detainees or that the facility
holding him flouted proper COVID-19 safety measures. Without showings of
this kind, Lewis cannot sufficiently demonstrate prejudice from his pretrial

incarceration. *See United States v. Gordon*, 93 F.4th 294, 309 (5th Cir. 2024) (reasoning that defendant could not show speedy-trial prejudice in part because he made no showing "that he was affected by any failure of the detention facility to follow proper COVID-19 safety protocol"); *United States v. Tantuwaya*, No. 22-50315, 2024 WL 701541, at *2 (9th Cir. Feb. 21, 2024) (unpublished) (determining defendant failed to show prejudice from his pretrial incarceration because he had not been "subject to more restrictive conditions than those experienced by other defendants incarcerated during the COVID-19 pandemic").

Lewis next asserts that he experienced heightened anxiety and concerns from his detention based on having contracted COVID-19 and being confined to a local jail. We've already stated why Lewis's exposure to COVID-19 while incarcerated in a county jail does not, on its own, establish speedy-trial prejudice. But Lewis offers two additional reasons for his alleged pretrial anxiety: (1) his monthly status conferences being held by telephone, and (2) the thirteen months of pole-camera footage that delayed his trial. The second rationale pertains to the reason-for-delay factor, not prejudice. And the first rationale makes little sense because delaying status conferences until the courthouse reopened after COVID-19 would have delayed Lewis's trial even further. Lewis does not explain how the court hosting these conferences telephonically caused him undue anxiety, and again, it seems to us that pressing

on with pretrial proceedings despite COVID-19's limitations was in Lewis's best interest for a speedy trial.

Impairment to the defense—the third form of speedy-trial prejudice—"is the most serious 'because the inability of a defendant to adequately prepare his case skews the fairness of the entire system.'" *United States v. Garcia*, 59 F.4th 1059, 1069 (10th Cir. 2023) (quoting *Seltzer*, 595 F.3d at 1179–80). Lewis argues that the two-year delay impaired his defense because "pretrial detention during Covid lockdowns inhibited his ability to assist with investigating his defense and affected witness's memories." Lewis Op. Br. at 35. By this, Lewis vaguely suggests that his "family members" could have testified that his role in Knighten's organization was minimal. *Id.*

We do not recognize prejudice for defendants who "identif[y] no witness who would have been available but for the delay" or who "do[] not claim that witnesses' memories have faded as a result of the delay." *United States v. Dirden*, 38 F.3d 1131, 1138 (10th Cir. 1994); *see, e.g.*, *Margheim*, 770 F.3d at 1330–31 (concluding defendant failed "to make *any* specific allegations concerning this 'witness,'" merely by "conten[ding] that he had lost track of 'a girl at [his] house that would be able to testify'"); *Garcia*, 59 F.4th at 1069–70 (reversing the district court's prejudice finding because even though the store where defendant shoplifted had closed during the pretrial delay—allegedly making the security-video evidence unavailable—defendant "never put forth evidence showing the video evidence would have been available at any time,

36

even if the [store] had not closed," therefore he failed to show his defense was prejudicially impaired). Even where a defense witness has died, this court has still declined to find prejudice because the defendant could not "state[] with particularity . . . what exculpatory testimony would have been offered." *Tranakos*, 911 F.2d at 1429 (quoting *United States v. Villano*, 529 F.2d 1046, 1060 (10th Cir. 1976)). Lewis identifies no specific defense witness made unavailable from the two-year delay. Nor does Lewis explain how testimony from his family members that he played a "minor role" in the drug-trafficking conspiracy would have exculpated him from the charged crimes. Lewis Op. Br. at 35.

Lewis hasn't shown prejudice under any of the interests protected by the speedy-trial right.

*Ponds.* Similar to Lewis, Ponds contends that his detention in a county jail during COVID-19 subjected him to unduly oppressive pretrial incarceration. For the same reasons as Lewis, these claims fail for being "too general," *Keith*, 61 F.4th at 854, because even though Ponds contracted COVID-19 during his detention, he has not "show[n] some special harm suffered which distinguishes his case" from all detainees in county jails during COVID-19, *id.* (quoting *Hicks*, 779 F.3d at 1169). *See, e.g.*, *United States v. Battle*, No. 21-50221, 2023 WL 2158807, at *1 (9th Cir. Feb. 22, 2023) (unpublished) (noting that defendant did "not claim to have been infected

before pleading guilty *or* to have faced different conditions than other pretrial detainees" (emphasis added)).

Ponds asserts that he was particularly prone to anxiety over his pretrial detention because he had been wrongfully detained "in a prior case for more than 24 months, only to be acquitted," exacerbating his anxiety that he would suffer the same fate again. Ponds Op. Br. at 29. This does not convince us that he experienced "concern and anxiety over his impending trial" any different "from that of any other arrestee awaiting trial." *Dirden*, 38 F.3d at 1138. Presumably, any arrestee who maintains his innocence would worry about being wrongfully detained. Unlike the defendant in *Margheim*—who showed that he "required anxiety and depression medication," *see* 770 F.3d at 1329—Ponds has made only "[g]eneralized and conclusory references to the anxiety and distress that purportedly are intrinsic to incarceration," *Nixon*, 919 F.3d at 1276 (quoting *Larson*, 627 F.3d at 1211). And even in *Margheim*, we noted that the district court's prejudice finding based on the defendant's anxiety medication was questionable, but we declined to disturb the court's ruling on that issue. 770 F.3d at 1330; *see id.* (upholding the district court's prejudice ruling on the more important impairment-of-defense prejudice factor). By contrast, Ponds offers no evidence of particular anxiety he suffered as a result of or during his pretrial incarceration. Ponds's anxiety based on a prior experience is not sufficiently particular to show prejudice.

To show that the two-year delay impaired his defense, Ponds embarks on a meandering recitation of the various pretrial motions he filed to request new counsel, his counsel's deficient performance in arguing the speedy-trial motion before the district court, his counsel's alleged failure to "join other important arguments raised in other defendants' motions," and overall complaints about the effectiveness of his representation. Ponds Op. Br. at 31. Ponds misunderstands the impairment-of-defense interest. "Prejudice to the defendant in this regard will be 'obvious' if witnesses die or disappear, or if witnesses lose their memory of events that are critical to the theory of defense." *Margheim*, 770 F.3d at 1329. Effectiveness of defense counsel's representation has no bearing on this analysis. *Toombs*, 574 F.3d at 1275 (explaining that defendant had not presented "a situation where, for example, as a result of the delay, [he] no longer had access to certain evidence or could no longer use a witness because that witness died before trial," and so his "defense ha[d] not been hindered in the sense envisioned by the *Barker* analysis"). Only when the defendant has been denied counsel altogether has this court recognized "an impairment of [defendant's] ability to defend and prepare his case" in a way that compelled us to recognize prejudice from the pretrial delay. *Seltzer*, 595 F.3d at 1180. Ponds has made no such claim here. For these reasons, he also hasn't shown prejudice.

### 5.  *Barker* Balancing

"Speedy trial claims require applying a balancing test." *Id.* at 1181 (quoting *Jackson v. Ray*, 390 F.3d 1254, 1266 (10th Cir. 2004)). The two-year delay Lewis and Ponds experienced triggers a *Barker* analysis under the first factor. *See* 407 U.S. at 530. But the length of this delay was not unreasonable given the complexity of the case. *See Seltzer*, 595 F.3d at 1176, 1181. The second factor—reason for delay—weighs slightly against the government, and the third factor—assertion of right—weighs heavily in favor of Defendants. Even so, "in most circumstances, failure to specify prejudice will eviscerate the defendant's claim." *Margheim*, 770 F.3d at 1329; *see Nixon*, 919 F.3d at 1278 ("[L]ack of prejudice is 'nearly fatal' to a [speedy-trial] claim." (quoting *Gould*, 672 F.3d at 939)). That is the case here. Defendants have shown so little prejudice that we cannot sustain their speedy-trial claims, even though some of the other *Barker* factors weigh in their favor. We therefore affirm the district court's denial of Defendants' motions to dismiss the indictment on speedy-trial grounds.

## II.  Wiretap Authorization

We consider next the district court's denial of Defendants' motions to suppress evidence obtained from the first wiretap. *See United States v. Lewis*, Nos. 20-10028-11, -15, -19, 2022 WL 486913, at *1 (D. Kan. Feb. 17, 2022). Defendants argue that the court erroneously denied their motions to suppress this evidence because the wiretap application was improperly authorized

according to the procedures outlined in 18 U.S.C. §§ 2516(1) and 2518(1)(a) and (4)(d).[14] Defendants perceive that reversing the district court's order would have a cascading effect. Ponds states that "both the second and third applications rely heavily on conversations intercepted pursuant to the first authorization order," Ponds Op. Br. at 52, and Lewis asserts that "almost every piece of evidence at trial was derived from the initial and subsequent wiretap intercepts," Lewis Op. Br. at 44. So essentially, Defendants argue that the improperly authorized application for the first wiretap negates all other evidence presented at trial. Lewis asks that we reverse the court's suppression order, vacate his conviction, and remand the case with instruction for the court to suppress all evidence derived from the first wiretap. Ponds seeks a reversal of the court's denial order and a remand for further proceedings. For the reasons stated below, we deny Defendants their requested relief.

"On appeal from a motion to suppress evidence obtained pursuant to . . . a wiretap, we accept the district court's factual findings unless clearly

---

[14] The court addressed a "complicated web of motions" from various defendants. *Lewis*, 2022 WL 486913, at *1. Lewis filed his own motion to suppress, though he later joined Knighten's motion to suppress. Ponds joined Lewis's motion first, and then filed a pro se letter, in which he requested to join Knighten's motion as well. The district court granted Lewis's motion to join Knighten's motion but never ruled directly on Ponds's pro se letter asking to join Knighten's motion. Regardless, the court's order denying all defendants' motions to suppress acknowledged that "Kevin Lewis, Travis Vontress, and Otis Ponds still challenge the validity of the wiretaps." *Id.* at *1. So we are satisfied that Ponds successfully joined Knighten's motion to suppress, preserving those arguments for his appeal.

erroneous and review questions of law de novo." *United States v. Smart*, 278 F.3d 1168, 1172 (10th Cir. 2002).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 authorizes law enforcement to intercept telephone communications. 18 U.S.C. §§ 2510–20. To do so, law enforcement must apply for authorization "in writing . . . to a judge of competent jurisdiction." § 2518(1). Before the application goes to the judge, it must be preapproved by the Attorney General or a high-ranking official at the Department of Justice (DOJ) specially designated by the Attorney General. § 2516(1). Title III lists the DOJ officials who have special designation to approve wiretap applications, including "[t]he . . . Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General . . . in the Criminal Division." *Id.* The wiretap application must contain certain information, including "the identity of . . . the [DOJ] officer authorizing the application." § 2518(1)(a). The reviewing judge "may grant . . . an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation," § 2516(1), which, among other things, "shall specify . . . the identity . . . of the [DOJ] person" who "authoriz[ed] the application," § 2518(4)(d).

Evidence obtained from an improperly authorized wiretap is inadmissible at trial. *See* § 2515. A defendant may move to suppress improperly obtained

wiretap evidence on three possible grounds, defined in § 2518(10)(a).[15] One ground for suppression arises when "the order of authorization or approval under which [the content] was intercepted is insufficient on its face." § 2518(10)(a)(ii).

In the district court, Knighten moved to suppress the evidence derived from the first wiretap under 18 U.S.C. § 2518(10)(a)(ii), asserting that "the documents submitted to the Court for authorization are facially insufficient" "[b]ecause the approval is not unequivocally signed by Bruce C. Swartz." R. vol. 1, at 1228–29. Defendants successfully moved to join Knighten's motion to suppress, which was the only motion before the court to raise the legibility of Swartz's signature as potential grounds for suppression. Because Defendants rely on Knighten's motion to preserve the signature issue for our review, and

---

[15] In full, § 2518(10)(a) states:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—

    (i)    the communication was unlawfully intercepted;

    (ii)   the order of authorization or approval under which it was intercepted is insufficient on its face; or

    (iii)  the interception was not made in conformity with the order of authorization or approval.

because Knighten explicitly invoked § 2518(10)(a)(ii) as the grounds for his motion to suppress the evidence from the first wiretap, subparagraph (ii) governs our analysis.[16] To determine whether the first wiretap's authorization order was facially sufficient under § 2518(10)(a)(ii), we start with the pertinent facts.

The first wiretap ran from April 10, 2019, to May 9, 2019, and intercepted communications from one cell phone used by Hill. *Lewis*, 2022 WL 486913, at *1. Assistant United States Attorney Matt Treaster, the lead prosecutor in this case, applied to the federal district court for authorization on April 9, 2019. The application comprised several documents.

The first document was an affidavit from AUSA Treaster that attested to his authority to apply for wiretap authorization under 18 U.S.C. § 1510(7) and stated the purpose, probable cause, and necessity of the requested wiretap. Relevant here, the affidavit swore that the wiretap application had been authorized by a "specially designated" member of the DOJ as required by 18 U.S.C. § 2516—in this case, Deputy Assistant Attorney General, Bruce C. Swartz. Suppl. R. vol. 1, at 8.

---

[16] It is unclear from Defendants' appellate briefing on which available grounds under § 2518(10)(a) they base their arguments. The district court's order also does not identify which grounds under § 2518(10)(a) justified the motions to suppress, though the court's order acknowledges that the government did not challenge Defendants' standing to file the motions. *Lewis*, 2022 WL 486913, at *5 n.6.

The second document was a memorandum dated April 5, 2019, from "Brian A. Benczkowski[,] Assistant Attorney General[,] Criminal Division" at DOJ, to "J. Robert Bryden[,] Acting Director of Office of Enforcement Operations[,] Criminal Division" at DOJ, and designated for the attention of "Matt Treaster." *Id.* at 20. The memo stated that "the appropriately designated official authorizes the above-described application," exercising his power under § 2516(1). *Id.* The signature block at the bottom of this memo displayed two names: Brian A. Benczkowski and Bruce C. Swartz. A signature appeared on the document above Swartz's hand-stamped name and title, like this:



*Id.* at 21. The district court found that this memo was sent from DOJ to AUSA Treaster, to confirm that Bruce C. Swartz had exercised his statutory power to authorize the wiretap application. *Lewis*, 2022 WL 486913, at *1.

The third document was another memo dated April 5, 2019, to the United States Attorney for the District of Kansas, Stephen R. McAllister, similarly stating that "[a]n appropriate official hereby approves an application to be made to a federal judge of competent jurisdiction for an order under [18 U.S.C. § 2518]." Suppl. R. vol. 1, at 22. Just like the DOJ memo, the signature block at the bottom of this memo displayed the names of Benckowski and Swartz, but was signed in Swartz's space, only, above a stamp of Swartz's name and title:

Brian A. Benczkowski
Assistant Attorney General
Criminal Division

APR 0 5 2019

Date

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

*Id.* at 23.

The fourth document in AUSA Treaster's application to the district court was Order No. 4417-2019, issued in 2019 by then-Attorney General William P. Barr. *Id.* at 24. The order granted "any Deputy Assistant Attorney General of the Criminal Division" in the DOJ authority "to exercise the power conferred by Section 2516(1) of Title 18, United States Code, to authorize [wiretap] applications." *Id.* at 24.

46

The fifth, and final, document appended to AUSA Treaster's application was an affidavit from Agent Heath, which detailed the FBI's investigation of the drug conspiracy, the reason for requesting a wiretap on Hill's cell phone, and the probable cause and necessity to support the wiretap.

Having received these documents, United States District Judge John W. Broomes issued an order, on April 9, 2019, authorizing the first wiretap on Hill's cell phone. *Lewis*, 2022 WL 486913, at *1. The court's authorization order names "Bruce C. Swartz, Deputy Assistant Attorney General, a duly designated official of the Criminal Division," as the DOJ official who authorized the wiretap application and states Swartz's authority to give such authorization under § 2516(1). Suppl. R. vol. 1, at 74.

Three defendants (Lewis, Knighten, and Orlando Hogan) filed motions to suppress evidence obtained under the first court-authorized wiretap. These motions attacked several aspects of the first wiretap's authorization, including probable cause, necessity, and proper authorization by a "statutorily approved person." *Lewis*, 2022 WL 486913, at *5. In a written order, the district court denied the motions to suppress.[17] The court acknowledged that the argument

---

[17] Before issuing its written ruling, the district court heard arguments on the motions to suppress. At the motion-to-suppress hearing, Agent Heath testified that he did not know Swartz or what Swartz's signature looked like, when asked by the defense. Yet the prosecutor averred that Agent Heath's affidavit attached to the wiretap application constituted further proof that Swartz's signature was genuine. The court pushed back that Swartz's signature was outside Agent Heath's knowledge, given his earlier testimony. The

*(footnote continued)*

about Swartz's signature was "fair" because "the signature . . . is difficult to reconcile with DAAG Schwartz's name." *Id.* at *11. Yet the court affirmed the wiretap's proper authorization, partly because the statute does not require authorization by signature, but also, because "a named designee whose high office gives him statutory power to authorize electronic surveillance orders is presumed to have properly exercised that power and the conditions precedent are presumed to have been met unless the defendants offer evidence, apart from mere conjecture or speculation, to rebut this presumption." *Id.* (quoting *United States v. O'Connell*, 841 F.2d 1408, 1416 (8th Cir. 1988)). Focusing on this second point, the district court elaborated that "the name stamp of a [statutorily approved person] along with an apparent signature, is enough for the Court to conclude that the application was properly authorized." *Id.*

On appeal, Lewis and Ponds both challenge the district court's ruling on the wiretap's authorization. Lewis contends (1) that "[t]he signature does not appear to be 'Bruce C. Swartz'"; (2) that "the government failed altogether to introduce any evidence to support its burden to prove that a high-level Department of Justice official had properly authorized the first wiretap application"; and (3) that the district court wrongly applied the presumption of

---

prosecutor then represented to the court that he had emailed with Swartz, who confirmed in that email exchange that the signature on the memo was his. The court asked whether anything other than Swartz's signature could demonstrate authorization of the wiretap application, and the government had nothing else to present. None of this impacts our decision on the authorization issue.

proper authorization because "[t]hat presumption applies only when the government has first established that a wiretap had been properly authorized, as indicated by **a signature** and other supporting evidence." Lewis Op. Br. at 42–43. Lewis insists that there is no proof the signature on the memo belongs to Bruce C. Swartz. For his part, Ponds argues (1) that "it is difficult to square" the signature with Swartz's name; (2) that the district court misapplied the presumption from *O'Connell* because, unlike that case, "the signature [here] is of an unknown individual"; and (3) that, contrary to the court's statement, the Defendants "*did* offer evidence to rebut any presumption that Swartz followed the proper procedure" by pointing out that "[t]he signature does not match." Ponds Op. Br. at 47–50. Ponds also asserts that if the evidence from the first wiretap is suppressed, then the evidence from the second and third wiretaps must be suppressed as well because the probable cause for the later wiretaps was established from conversations intercepted on the first wiretap.

These arguments are unavailing. The only card Defendants have to play is a flimsy one: that, at first blush, the signatures on the April 5, 2019 memos are illegible as any name, including "Bruce C. Swartz." From this, Defendants take a huge leap by urging that the signature must belong to someone else, at worst, someone unapproved to authorize a wiretap under Title III. Defendants fault the government for presenting insufficient evidence to prove who authorized the wiretap, if not Swartz.

But Defendants misunderstand the standard for suppressing evidence under 18 U.S.C. § 2518(10)(a)(ii). This provision requires suppression when "the order of authorization or approval under which [the evidence] was intercepted is insufficient on its face." *Id.* In *Dahda v. United States*, the Supreme Court explained what makes an authorization order "insufficient" under subparagraph (ii). 584 U.S. 440, 448–49 (2018). "An order is 'insufficient,'" the Court said, "insofar as it is 'deficient' or 'lacking in what is necessary or requisite.'" *Id.* at 450 (quoting 5 Oxford English Dictionary 359 (1933)). Though *Dahda* declined to answer "just which kinds of defects subparagraph (ii) covers," the Court did advise that an authorization order lacks "necessary or requisite" information if it "fail[s] to include information that § 2518(4) specifically requires the order to contain."[18] *Id.* at 449–50. This includes "the identity . . . of the person authorizing the application." § 2518(4)(d). This seems to be Defendants' principal complaint—that the order

---

[18] Because *Dahda* didn't define with precision the class of defects that require suppression under subparagraph (ii), other circuits since *Dahda* have grappled with that question. *See United States v. Brunson*, 968 F.3d 325, 331 (4th Cir. 2020) (concluding "that the absence of the official's name from the face of the [authorization] orders, even if technically a defect, is not the type of defect that would render these orders facially insufficient"); *United States v. Friend*, 992 F.3d 728, 730–31 (8th Cir. 2021) (reviewing authorization orders that failed to identify the specific DOJ officials by name, even though the underlying wiretap applications did designate specific DOJ officials as the authorizing personnel). This case does not send us into those uncharted waters because, as we discuss below, Defendants have identified no defect with the authorization order in this case.

doesn't identify the person who authorized the first wiretap application because the signature doesn't look like "Bruce C. Swartz."

But neither § 2518(1)(a) nor (4)(d) say anything about a signature. Under Title III, all the application and authorization order must do is state "the *identity*" of the authorizing official. Sure enough, both documents identify Bruce C. Swartz by name as the authorizing official. And on all the documents, his name is not only accompanied by a signature, but also by his personal stamp.

In *United States v. Chavez*, the Supreme Court reviewed a challenge to two wiretap authorizations that misidentified the authorizing official under § 2518(1)(a) and (4)(d). 416 U.S. 562, 570 (1974). Both applications identified Assistant Attorney General for the Criminal Division, Will Wilson, as the authorizing official, when one application had been approved by the Attorney General and the other by the Attorney General's Executive Assistant. *Id.* at 565. Evidence from both wiretaps was suppressed in the district court, and those orders were upheld on appeal. *Id.* at 567–68. The Supreme Court reversed that decision in part, holding that the wiretap application authorized by the Attorney General was sufficient, even though the wiretap application misidentified the specially designated DOJ official who had authorized the wiretap, because the actual authorizing official—the Attorney General—had his own authority to approve the application. *Id.* at 572–73. Because the wiretap was indeed authorized by an official designated under § 2516(1), just not the

one stated on the application, the order complied with Title III and the evidence derived from the wiretap could not be suppressed under § 2518(10)(a)(ii). *Id.* at 573–74.

Considering the facial sufficiency of the misidentified wiretap application, the Supreme Court observed that "the interception order clearly identified 'on its face' Assistant Attorney General Wilson as the person who authorized the application to be made." *Id.* at 573. And Wilson, the Court noted, was indeed a statutorily authorized person under § 2516(1) to authorize wiretap applications. *Id.* So even though it was later revealed that the Attorney General, not Wilson, had actually authorized the wiretap, the Court still concluded that the misidentification "d[id] not detract from the facial sufficiency of the order." *Id.* at 574.

This discussion from *Chavez* settles that the authorization order here is facially sufficient under § 2518(10)(a)(ii). This case presents facts less egregious than *Chavez* because there is no evidence showing or even suggesting that anyone other than Bruce C. Swartz authorized the first wiretap application. The backstop for all the Defendants' arguments is that the illegibility of Swartz's signature means it must not be his. Ponds insists that because, in his view, "[t]he first letter of the first name looks like a 'J'" and not "a 'B,'" and because "the first letter of the last name" doesn't look like "an 'S,'" then therefore the April 5, 2019 memos must have been signed by someone other than Swartz. Ponds Op. Br. at 47. Both Defendants lean on the district court's

recognition that this signature is "difficult to reconcile with DAAG Schwartz's name." *Lewis*, 2022 WL 486913, at *11. But Defendants ignore the court's other comment that "it is often tricky to discern a name scrawled quickly in cursive." *Id.* Indeed, it is. So we focus on what is discernible.

AUSA Treaster's wiretap application names "Bruce C. Swartz" as the statutorily authorized official who preapproved the application. The district court's authorization order also names "Bruce C. Swartz" as the "duly designated official of the Criminal Division" who authorized the wiretap. Suppl. R. vol. 1, at 74. Two separate memos were sent on April 5, 2019, one to the Kansas U.S. Attorney and the other to AUSA Treaster, and both documents bear a signature above the name "Bruce C. Swartz." Those signatures match each other. Both memos also bear the personal stamp of "Bruce C. Swartz," identifying him as a Deputy Assistant Attorney General of the Criminal Division—a position with authority to approve wiretap applications under § 2516(1). All of this is more than enough to identify Swartz as the statutorily approved "person" and "official" who authorized the first wiretap. § 2518(1)(a), (4)(d).

These facts are a far cry from cases where courts have deemed wiretap authorizations facially deficient under subparagraph (ii). In those cases, the authorization orders typically fail to identify any authorizing individual by name, which is not the situation here. *See United States v. Scurry*, 821 F.3d 1, 8, 12 (D.C. Cir. 2016) (affirming the district court's ruling that two wiretap

orders were "facially insufficient under 18 U.S.C. § 2518(10)(a)(ii)" because "where th[e] official's name should appear, there are only asterisks"); *United States v. Lomeli*, 676 F.3d 734, 740–42 (8th Cir. 2012) (concluding the wiretap application was "insufficient on its face" because "the application in this case just states generically that 'an appropriate official of the Criminal Division' had authorized the application," giving the "authorizing judge . . . no way of knowing the name of the actual, statutorily designated official that had indeed authorized the application"); *United States v. Radcliff*, 331 F.3d 1153, 1162 (10th Cir. 2003) (determining the wiretap orders were facially deficient because the orders "did not specify the identity of any person" but rather "listed by title every Department of Justice official with legal authority to authorize an application").

The purpose of § 2518(1)(a) and (4)(d) is to "fix[] responsibility" for the wiretap to a specific DOJ official to deter potential misuse or abuse of electronic surveillance. *See* S. Rep. No. 90-1097, at 101 (1968); *see id.* at 97 (discussing the importance of "centraliz[ing] in a publicly responsible official" the proper execution of "electronic surveillance techniques" to "avoid the possibility that divergent practices might develop" because, "[s]hould abuses occur, the lines of responsibility lead to an identifiable person"). The identification of Bruce C. Swartz by name as the authorizing official on the wiretap application, *see* § 2518(1)(a), and the court's authorization order, *see* § 2518(4)(d), sufficiently affixes the responsibility that Congress intended.

Moreover, Congress easily could have written Title III to require that statutorily approved DOJ officials authorize wiretap applications with *authenticated* signatures, whether through a notary, witness, or some other way. But Congress chose not to. *See United States v. de la Fuente*, 548 F.2d 528, 534 (5th Cir. 1977) (stating that "[n]othing in the statute governing the authorization of wiretaps . . . requires that the government must authenticate the attorney general's signature on an authorization order as a predicate to use of wiretap evidence" and that Congress elected not to install "safeguard[s]" such as "requiring that an authorization signature be notarized, witnessed, or authenticated by personal testimony at trial"). Accordingly, we see no facial defect with an order that identifies Bruce C. Swartz by his name, his personal stamp, and an accompanying signature.[19] *See Dahda*, 584 U.S. at 449 ("The statute means what it says. That is to say, subparagraph (ii) applies where an order is 'insufficient on its face.'" (quoting § 2518(10)(a)(ii))).

At bottom, Defendants have presented no evidence that the signature at issue is not Swartz's. As it happens, our own research reveals that the signature likely does belong to Swartz. His signature in other case records matches the ones on both April 5, 2019 memos:

---

[19] Our disposition of the signature issue does not depend on applying the presumption from *United States v. O'Connell*, 841 F.2d 1408 (8th Cir. 1988).

APR 0 5 2019

_____
Date

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

Suppl. R. vol. 1, at 21.

APR 0 5 2019

_____
Date

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

Suppl. R. vol. 1, at 23.

Bruce C. Swartz
Deputy Independent Counsel

Brief of the United States of America, *United States v. Dean*, 55 F.3d 640 (D.C. Cir. 1995) (No. 94-3021).

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

Supplemental Appendix for Appellee, *United States v. Scurry*, 821 F.3d 1 (D.C. Cir. 2016) (Nos. 12-3104, -3105, -3109, 13-3055, -3068).

We are satisfied that the authorization order sufficiently identifies Bruce C. Swartz as the authorizing official for the first wiretap, as § 2518(1)(a) and (4)(d) require. Because Defendants fail to identify any defect in the authorization order that requires suppression under § 2518(10)(a)(ii), we affirm the district court's denial of the motions to suppress.

## III.   Lewis's Sentence

Lewis argues that his 420-month sentence is unreasonable under the § 3553(a) sentencing factors and that the district court should have granted his requested downward variance to 227 months. He challenges only the substantive reasonableness of his sentence. *See United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008) ("[A]ppellate review for reasonableness includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence.").

The presentence report recommended a guidelines range for Lewis of 360 months to life imprisonment, calculated from Lewis's total offense level of 40 and criminal history category of IV. At the sentencing hearing, the government asked that Lewis receive a longer sentence than other codefendants because the success of Knighten's organization "was wholly and entirely dependent on the actions of fiercely loyal lieutenants like Mr. Lewis." R. vol. 6, at 2330. The government noted that Lewis dealt drugs and made money for the organization and that, unlike some of his codefendants (like Knighten), Lewis had not

pleaded guilty and accepted responsibility for his actions. All of this, the government asserted, supported a sentence of 400 months' imprisonment. In response, Lewis asked for a downward variance to 227 months, the same sentence as another codefendant in the organization. He reasoned that his role in Knighten's organization was minimal compared to Knighten himself. Lewis argued that Knighten should receive "the highest sentence among this ring," and that Lewis, a mere subordinate, ought to receive a sentence commensurate with others received by his codefendants in the lower ranks. *Id.* at 2345.

The district court sentenced Lewis to 420 months' imprisonment, denying Lewis his requested downward variance to 227 months. The court supported its decision by observing that Lewis played a key role in Knighten's organization because, without Lewis, Knighten "would have been a toothless tiger." *Id.* at 2356. The court was persuaded that Lewis presented a different case than some of the other codefendants, who dealt solely with the money side of the organization, because Lewis was on the ground as "the operational muscle and enforcer." *Id.* This made Lewis's role critical to the entire operation, in the court's mind. The court was also influenced by Lewis's significant criminal history and by his failure to accept responsibility for his conduct. Lewis appeals his sentence and asks us to vacate his judgment of conviction and remand his case for resentencing.

"We review substantive reasonableness for an abuse of discretion," and will uphold the sentence imposed unless the sentencing decision "exceeds the

bounds of permissible choice, given the facts and the applicable law." *United States v. Ware*, 93 F.4th 1175, 1180 (10th Cir. 2024) (first quoting *United States v. Williams*, 10 F.4th 965, 977 (10th Cir. 2021); and then quoting *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013)). Given our substantial deference to the district court's discretion in sentencing, we do "not reweigh the [§ 3553(a)] sentencing factors" on appeal, we instead "ask whether the sentence fell within the range of rationally available choices." *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019) (citation omitted). More too, sentences that fall within the advisory guidelines range are "entitled to a presumption of reasonableness." *United States v. Maldonado-Passage*, 56 F.4th 830, 842 (10th Cir. 2022).

Lewis argues that his sentence is longer than reasonably necessary to achieve two sentencing goals under § 3553(a): to avoid a sentencing disparity among similarly situated offenders and to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of criminal punishment]." 18 U.S.C. § 3553(a). Lewis reminds us that Knighten received a 300-month sentence and Armando Luna, another codefendant and Knighten's supplier, received a 360-month sentence, while Lewis was sentenced to serve 420 months.[20] Lewis attacks the court's favoring Knighten and Luna for

---

[20] By the time of Lewis's sentencing hearing, Luna had already pleaded guilty and been sentenced to 360 months. The government's plea deal for Knighten requested a 300-month sentence, though Knighten had not yet been sentenced. Knighten was ultimately sentenced to 300 months' imprisonment.

accepting responsibility because "both of them were already serving lengthy prison sentences," and he maintains that his role was minimal compared to theirs. Lewis Op. Br. at 49. Given these circumstances, Lewis contends, his 420-month sentence is "disproportionate" and longer than necessary to achieve the § 3553(a) sentencing goals. *Id.* at 52.

As has been stated many times, this was a complex case. Twenty-four defendants were charged. The district court knew best how each defendant contributed to the drug-trafficking scheme. At sentencing, the district court explained how Lewis's role as "the symbolic figurehead" of the organization distinguished him from other members, and so justified him receiving a higher sentence than other codefendants higher up the food chain. R. vol. 6, at 2356. The court openly considered and balanced the § 3553(a) factors, before it imposed a within-guidelines-range sentence of 420 months and denied Lewis's request for a downward variance. Thus, the court's decision was not "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Hurst*, 94 F.4th 993, 1010 (10th Cir. 2024) (citation omitted). Lewis's argument fails.

## CONCLUSION

We affirm the judgment of the district court.